## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SOUTHWEST MEDIA MOBILE, LLC,

          Plaintiff,

vs.                                                         No. CIV 13-0248 JB/KBM

CITY OF RIO RANCHO,

          Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Consolidated Motion for Summary Judgment and Memorandum in Support, filed July 25, 2013 (Doc. 15)("MSJ"). The Court held a hearing on November 22, 2013. The primary issues are: (i) whether Defendant City of Rio Rancho violated Plaintiff Southwest Media Mobile, LLC's rights under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States of America when it adopted an ordinance that prohibits some of Southwest Media's services; and (ii) whether, if the Court concludes that Rio Rancho did not violate Southwest Media's rights under the Equal Protection Clause, the Court should remand the case. The Court will grant the MSJ in part. The Court concludes that Southwest Media has not presented evidence that Rio Rancho has treated it differently from another entity that is similarly situated in every material respect, or that it lacks a rational basis for adopting the ordinance. Its equal-protection claim, therefore, fails. Although the parties suggest -- albeit inconsistently -- that Southwest Media had asserted a claim that Rio Rancho had violated the Takings Clause of the Fifth Amendment to the Constitution of the United States of America, the Court's review of the record reveals that Southwest Media has not stated such a claim, but instead has asserted a claim that Rio Rancho has violated an analogous provision of the Constitution of the

State of New Mexico.  This conclusion, with the ruling on the federal equal-protection claim, disposes of all federal claims in the case. The Court will decline to exercise supplemental jurisdiction over the remaining state-law claims and will, therefore, remand the case.

## FACTUAL BACKGROUND

To place the MSJ in context, the Court takes the following facts from Southwest Media's Verified Complaint for Declaratory Relief, Rio Rancho Sign, and Injunctive Relief and Damages, filed in state court February 8, 2013, filed in federal court March 15, 2013(Doc. 1-1)("Complaint"). This case arises out of a dispute between Southwest Media, a New Mexico limited liability company authorized to do business in Sandoval County, New Mexico, and Rio Rancho, a New Mexico municipal corporation located in that county.  See Complaint ¶¶ 1-2, at 1. Southwest Media "has mobile signs and rents said signs to numerous businesses in Rio Rancho."  Complaint ¶ 4, at 1.  Until recently, Southwest Media's "signs were allowed[,] but were subject to certain rules and regulations. . . . These signs were limited to no more than thirty (30) days in any location.  In addition, there were limits on the size of the signs."  Complaint ¶¶ 7-8, at 2. Rio Rancho "recently passed an ordinance which limits Plaintiffs['] ability to use its signs."  Complaint ¶ 5, at 1. Southwest Media's president was cited for violating that ordinance.  See Complaint ¶ 5, at 2.  Rio Rancho "has mobile advertising on buses owned by the city," Complaint ¶ 13, at 2, and Southwest Media's "signs are the only signs being affected by this ordinance while other mobile signs are continuing to be used," Complaint ¶ 18, at 3.

The following facts are undisputed.  "The State of New Mexico suffered 353 traffic fatalities in 2012, 79 of which occurred in an urban setting, and New Mexico did not meet its performance measure for reducing total fatalities by the projected amount in 2012."  MSJ ¶ 6, at 3

(internal quotation marks omitted)(setting forth this fact); Response ¶ 7, at 2 (not disputing this fact).[1]  On August 14, 2012, the Planning and Zoning Board for the City of Rio Rancho held a public meeting at which it amended Chapter 156 of Rio Rancho's Ordinance No. 28.[2]  See Affidavit of David Heil ¶¶ 1-4, at 1 (executed July 1, 2013), filed July 25, 2013 (Doc. 15-1)("Heil Aff."); Plaintiff's Consolidated Response to Motion for Summary Judgment and Memorandum in Opposition to Summary Judgment ¶ 1, at 2 filed August 12, 2013 (Doc. 16)("Response")(not disputing this fact).  "The amendments were proposed 'pursuant to discussion with citizens, [sic] the business community' after 'staff reviewed the Sign Ordinance at length,' and they were adopted two months after the Board's vote by Mayor Thomas E. Swisstack on October 1, 2012."  MSJ ¶ 2, at 2 (setting forth this fact)(quoting An Ordinance Amending Chapter 156 Sign Regulations at 1, filed July 25, 2013 (Doc. 15-2)("the Ordinance")).  See Response ¶ 2, at 2 (not disputing this fact).[3]

---

[1] Southwest Media contends that "[t]he number of fatalities in New Mexico has no relevance in this case.  The City of Rio Rancho has no evidence that any of Plaintiff's signs ever affected traffic or public safety."  Response ¶ 6, at 2.  Whether the fact is material is a question for the Court to decide, and is more properly determined in the analysis.  Moreover, it is material, because it provides context for Rio Rancho's concern with public safety.  Further, because Southwest Media has not specifically controverted the factual allegation, the Court deems it undisputed.  See D.N.M. LR-Civ. 56.1(b).

[2] The Parties have not provided the Court with the original, unamended ordinance.  The Court could infer that the "black-lined" text under the amended version of the Ordinance that the Parties did provide, but the Court is conscious of the fact that the amended version may not include the full unamended ordinance.  Further, nothing material turns on the difference between the unamended ordinance and the final ordinance.

[3] Southwest Media "does not dispute that the Ordinance was adopted."  Response ¶ 2, at 2.  Southwest Media also alleges that "[t]he discussion for the business community was ignored and was targeted at" Southwest Media, Response ¶ 2, at 2, but does not explain this statement's relevance.  The Court, therefore, deems this fact -- that the amendments to the ordinance "were proposed 'pursuant to discussion with citizens, [sic] the business community' after 'staff reviewed the Sign Ordinance at length,' and they were adopted two months after the Board's vote by Mayor Thomas E.

"Plaintiff's owner, Alan Varner, was present at public meetings that concerned the same provisions in the Ordinance, and he submitted comments on the record about the ordinance."  MSJ ¶ 7, at 3 (setting forth this fact); see Response ¶ 7, at 2 (not disputing this fact).[4]

As amended, § 156.22(D)(1)-(4) provides:

(1) No more than one temporary sign as described in this sub-section shall be permitted per business.

(2) The sign shall be located on the same lot as the business, not in the public right-of-way.

(3) The sign shall be removed during non-business hours of the retail business and stored inside the business and away from the public view and shall also be removed when weather conditions create potentially hazard [sic] conditions.

(4) See Appendix B for additional stipulations as to type, size, and number of signs permitted.

The Ordinance at 2.[5]  The referenced "Appendix B" is a table that comprehensively regulates the

_____

Swisstack on October 1, 2012" -- undisputed.  See D.N.M. LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[4] Southwest Media's response to this factual assertion states: "Plaintiff admits that Alan Varner made comments on the record concerning the Ordinance."  Response ¶ 7, at 2.  Because Southwest Media does not respond to the remainder of the allegation, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b).

[5] Southwest Media "admits that the Ordinance does not prohibit the use of mobile signs," Response ¶ 3, at 2, but contends that "[t]he amendments however target only the signs owned by Plaintiff.  These prohibitions on Plaintiff's signs are unreasonable and have no legitimate purpose other than to target Plaintiff," Response ¶ 3, at 2.  Southwest Media does not explain the first sentence's relevance, in light of the factual allegation.  The second sentence is substantially a legal conclusion and not a fact, and is not, therefore, properly characterized as a "fact" for summary-judgment purposes.  See Ruiz v. City of Brush, No. 05–897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;] [l]egal argument should be reserved for separate portions of the brief.'").  The Court, therefore, deems the fact undisputed.  See D.N.M. LR-Civ. 56.1(b).

location and size of signs in various settings.  See Appendix B Signs by Type and Sign District, filed

July 25, 2013 (Doc. 15-3)("Appendix B").  The Ordinance provides that, in most districts of Rio

Rancho, "[c]ommercial vehicle signs must be on an operable vehicle, currently registered and

licensed to operate on public streets and actively used in the daily function of the business to which

some signs relate."  Appendix B at 11.  A sign is a "commercial vehicle sign" under the Ordinance if

"[t]he primary purpose for which the vehicle [on which the sign is displayed] is used is not for the

stationary display of the sign."  Appendix C - Definitions at 14, filed July 25, 2013 (Doc. 15-3).  The

Ordinance further provides that, in most districts of Rio Rancho, "[m]obile billboards may not be

parked, except for lunch from 12:00 p.m. to 1:00 p.m. on any property except where it may be legally

parked for storage."  Appendix B at 11.  The Ordinance defines "mobile sign" as "[a]ny sign placed

upon, applied to the surface of, or attached to a motorized vehicle or towed trailer that is driven on

public streets primarily for the purpose of displaying the signage on them; signs commonly referred

to as 'mobile billboards.'"  Appendix C - Definitions at 15.[6]

On December 3, 2012, Walter D. Bolon, a "Code Enforcement S[]upervisor for the City of

Rio Rancho since September 5, 2005," "cited Alan Varner, owner of Southwest Media Mobile, for

violating the Ordinance because his mobile sign advertising [a restaurant] was greater than twelve

(12) square feet in size, and because it was displayed at the entrance to Mariposa Community Center

at 2501 Parkway Ave NE, Rio Rancho, NM 8714[4]."  Affidavit of Walter D. Bolon ¶¶ 2-4, at 1,

---

[6] Although the parties characterize the Ordinance's purpose differently, the parties substantially agree with respect to the Ordinance's provisions.  See MSJ ¶¶ 3-4, at 2-3 (summarizing the Ordinance); Response ¶¶ 3-4 (substantially agreeing with that summary).  Regardless, their competing characterizations of the Ordinance are substantially legal arguments and are not properly characterized as "facts" for summary-judgment purposes.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4.  The Court, therefore, takes its understanding of the Ordinance from its text.

filed July 25, 2013 (Doc. 14-4)("Bolon Aff.")(setting forth these facts).  See Response at ¶ 5, at 2 (not disputing this fact).  "Prior to the criminal trial the case was dismissed."  Response ¶ 5, at 2 (setting forth this fact); see Reply at 5 (not disputing this fact).

In its Response, Southwest Media lays out a number of "additional factual allegations" that, it thinks, put the undisputed material facts in context.  Almost every one of those additional allegations finds support only in the Affidavit of Alan Varner, executed August 12, 2013, filed August 12, 2013 (Doc 16-1)("Varner Aff.").  It is undisputed that: (i)  "Alan Varner previously devoted 95% of his time to the business of Southwest Media,"  Response ¶ 11, at 3; (ii) Southwest Media "owns 14 signs measuring from 8' by 20' to 11' by 23',"  Response ¶ 12, at 3; (iii) Southwest Media "invested approximately $300,000.00 in signs and trucks,"  Response ¶ 18, at 3; (iv) Southwest Media's "signs cannot be cut down and made smaller,"  Response ¶ 15, at 3; and (v) Southwest Media's gross income "has ranged from $100,000.00 to $500,000.00 over the first 11 years of the business," Response ¶ 19, at 3.[7]

Southwest Media states that it "is the only mobile sign company in Rio Rancho."  Response ¶ 13, at 3.[8]  "Numerous businesses use Southwest's signs to promote special events." Response ¶ 17,

---

[7]  Rio Rancho does not specifically controvert these allegations, but says that "merely describing the contours of Plaintiff's business does not create a genuine dispute about Defendant's material facts, and it is not Defendant's burden to produce evidence negating Plaintiff's alternative factual presentation."  Reply at 14.  Because the local rules provide that "[a]ll material facts set forth in the Response will be deemed undisputed unless specifically controverted," D.N.M. LR-Civ. 56.1(b), the Court concludes that these facts are undisputed.

[8]  Rio Rancho does not specifically identify this assertion and specifically controvert it; it states only, rather, that the factual allegation is immaterial.  The Court will decide materiality in its analysis.  The Court, therefore, deems this factual allegation undisputed.  See D.N.M. LR-Civ. 56.1(b).

at 3.[9]  Rio Rancho "sells advertising on [its] public transportation buses and receives revenue from

advertising on the local school buses."  Response ¶ 20, at 3.[10]

Rio Rancho targeted Southwest Media because of Varner's political speech.  Response ¶ 8, at

2 (citing Varner Aff. ¶¶ 12-13, at 2).[11]  Rio Rancho has "never presented any reason for the

_____

[9] Rio Rancho contends that: (i) this allegation is immaterial; and (ii) Varner offers no evidence to demonstrate that he has personal knowledge of this allegation.  See Reply at 14.  The Court will decide materiality in its analysis.  Reading the evidence in the light most favorable to Southwest Media, by making these statements under oath, Varner implicitly swore that he had knowledge of this fact.  The Court, therefore, deems this factual allegation undisputed.

[10] Rio Rancho contends that: (i) this allegation is immaterial; and (ii) Varner offers no evidence to demonstrate that he has personal knowledge of these allegations.  See Reply at 14.  The Court will decide materiality in its analysis.  Reading the evidence in the light most favorable to Southwest Media, by making these statements under oath, Varner implicitly swore that he had knowledge of this fact.  The Court, therefore, deems this factual allegation undisputed.

[11] Rio Rancho disputes this factual allegation, stating that the Ordinance "was adopted after public meetings of the Planning and Zoning Board and the City Council, which Varner attended and where he commented for the record," and arguing that the City Council members and the Mayor "analyzed how the amendments might affect Varner *and* several other members of the local business community."  Reply at 8 (emphasis in original)(citing Affidavit of Holcey C. Wilkins, filed September 9, 2013 (Doc. 18-1)).  Southwest Media's president, Varner, states that "Chuck Wilkins[,] a newly elected councilman, the day of the election in March 2012 caused me to be cited into municipal court" and that the case against him "was later dismissed because the original ordinance allowed [Southwest Media's] sign."  Varner Aff. ¶¶ 12-13, at 2.  Rio Rancho states that

> (i) neither Varner nor Southwest Media Mobile was cited on that date; instead, Michael Williams was cited; (ii) the mobile billboard did not display Varner's political speech; it displayed candidate Williams' campaign message; (iii) the reasons for issuing the citation were that Williams displayed the mobile billboard longer than the interval allowed under the Ordinance, and then refused to move the billboard to avoid being cited; and (iv) the officer who issued the citation had no idea who had called police to dispatch the officers.

Reply at 8.  Affidavit of Debby Griffin ¶ 5-6 at 1, filed September 9, 2013 (Doc. 18-3); Citation 2303, executed March 6, 2012, filed September 9, 2013; Citation 3040, executed April  10, 2012 (Doc. 18-3).  The Court deems this factual allegation of political targeting disputed, but given that the Court must construe all facts in Southwest Media's favor, accepts as true for purposes of the MSJ

restrictions on the mobile signs." Response ¶ 10, at 3.[12]

"The Ordinance targets only signs owned by Plaintiff while allowing signs that are much bigger and dangerous [sic] than the signs being prohibited." Response ¶ 9, at 3. Southwest Media cites photographs that purport to show "that other mobile signs are allowed to be parked where traveling public can see them." See Response ¶ 16, at 3; Varner Aff. ¶ 11, at 2.[13]

"The amendments to the sign ordinance make Southwest's signs worthless." Response ¶ 14, at 3.[14]

──────────────────

that Rio Rancho targeted Southwest Media for the political statements that had appeared on its signs.

At the hearing, Southwest Media contended that it provided advertising media for the losers in a local election, that its representative was cited the day of the election, and that its involvement "is the basis of why these signs are now being targeted by the current council." Tr. at 27:3-16 (Court, Border). Southwest Media did not provide further evidence on this point. Later in the hearing, however, Southwest Media expressly stated that the Court need not consider the factual allegations regarding political targeting, because Southwest Media has not presented a First Amendment claim. See Tr. at 28:13-18 (Court, Border). This political-targeting allegation is, therefore, immaterial.

   [12] Rio Rancho points the Court to the transcript of the City Council meeting, at which "all five Councilors, the Mayor, and Director of Development Services Dolores Wood extensively debate the justifications for several key provisions." Reply at 5-6. The Court deems this factual allegation disputed, but given that the Court must construe all facts in Southwest Media's favor, the Court will assume that Rio Rancho did not state a reason for the amendment at the time it was enacted.

   [13] Rio Rancho states that this factual assertion merely rephrases with the word "targets" the "truism" that the ordinance prohibits any signs which violate it, and that Southwest Media cannot simultaneously argue that traffic safety is irrelevant to the case and that the Ordinance is invalid because it allows signs more dangerous than those it prohibits. Moreover, Rio Rancho submits that the targeting allegation is "nothing more than the contention of Plaintiff's counsel disguised as a factual allegation." Reply at 9. Rio Rancho also contends that the pictured signs are not properly "mobile signs" within the meaning of the Ordinance. The Court concludes that these are legal arguments and are not, therefore, properly considered "facts" for summary judgment purposes. See Ruiz v. City of Brush, 2006 WL 1816454, at *4. The Court, therefore, deems this fact undisputed.

   [14] Rio Rancho asserts that "[t]his is not a fact at all, but merely an argument of Plaintiff's

## PROCEDURAL BACKGROUND

Southwest Media filed its Complaint on February 8, 2013.  See Complaint at 1.  The Complaint does not clearly delineate the causes of action that Southwest Media asserts or the relief that it seeks.  In "Count I - Declaratory Judgment," the Plaintiff alleges that the Ordinance "conflicts with NMSA §42A-1-34[15] [sic] in that the statute requires the payment of just compensation in causing the removal of Plaintiff's signs," and that it "is unconstitutional under both the New Mexico Constitution and United States Constitution in that said ordinance unfairly discriminates against Plaintiff's signs while allowing other mobile signs."  Complaint ¶¶ 12-13, at 2.  Southwest Media alleges that the Ordinance "denies Plaintiff equal protection under the U.S. and New Mexico Constitutions."  Complaint ¶ 13, at 2.  Southwest Media cites "the New Mexico Declaratory Judgment Act §44-6-6," Complaint ¶ 15, at 2, but appears to request the Court to enjoin implementation of the Ordinance, Complaint ¶¶ 16-22, at 3.  In "Count II - Taking Claim," the Plaintiff alleges:

---

counsel disguised as a factual allegation, which cannot be used to defeat summary judgment."  Reply at 14.  The Court disagrees.  The value of an object is a "fact," and if Rio Rancho disagrees with the factual assertion, it has an obligation to put contrary evidence about that statement.  It did not.  The Court, therefore, deems the fact undisputed.

[15] The statute provides:

No municipal, county or local zoning authority or any other political subdivision of the state shall remove or cause to be removed any lawfully erected and maintained advertising structure without paying just compensation. As used in this act [this section], "advertising structure" means and includes any outdoor sign, display, figure, painting, poster, billboard or similar thing designed, intended or used to advertise or inform the public of goods or services sold either on or off the premises where the advertising structure is located.

N.M. Stat. Ann. § 42A-1-34.

## COUNT II -- TAKING CLAIM

24.    The preceding allegations in this Complaint are realleged and incorporated herein by this reference as though stated in full.

25.  The enactment of the Ordinance has resulted in Southwest Media's assets being rendered worthless, constituting a taking of personal property rights under the NMSA §42A-1-34 [sic] and the New Mexico Constitution, N.M. Const. Article II, § 20 (2012), without just compensation.

Complaint ¶¶ 24-25, at 3.

The Joint Status Report and Provisional Discovery Plan, filed April 9, 2013 (Doc. 10), is no

clearer with respect to the claims that Southwest Media asserts.  It states as follows:

### PLAINTIFF'S CONTENTIONS:

1.    Ordinance Chp. 156 is in violation of:

   a) NMSA §42A-1-24 [sic]

   b) New Mexico Constitution

   c) U.S. Constitution.

2.    In enacting said Ordinance, the City of Rio Rancho has damaged Plaintiff.

3.    The Court should enjoin the city from enforcing this Ordinance.

### DEFENDANT'S CONTENTIONS

The City of Rio Rancho amended its sign ordinance in 2012 to impose certain regulations on mobile advertising signs within its borders.  The Regulations are content neutral and impose reasonable time, place and manner restrictions.  They do not violate federal or state law as a consequence.

Joint Status Report and Provisional Discovery Plan at 2.

The Notice of Removal, filed May 15, 2013 (Doc. 1), identifies only a single federal question

claim: an allegation of "discrimination and a violation of equal protection under the United States

Constitution." Notice of Removal ¶ 5.a, at 2. The Notice of Removal also states that the Plaintiffs'

state law claims are "related to the federal question claim," thus indicating that there is only one

federal claim in the case. Notice of Removal ¶ 6, at 2 (emphasis added).

In the Stipulated Order to Exceed Page Limits and to Extend the Time to File Defendant's

Reply to Motion for Summary Judgment, filed August 26, 2013 (Doc. 17)("Stipulated Order"), the

Court stated:

> 1.      Plaintiff brings an array of interrelated federal and state claims at law and
> equity, including a claim that recent amendments to the City of Rio Rancho's
> municipal ordinance render it constitutionally invalid; a takings claim; and an equal
> protection claim under the Fourteenth Amendment.

Stipulated Order ¶ 1, at 1 (emphasis added).

Rio Rancho moves the Court for summary judgment. Rio Rancho focused its efforts on what

it apparently understood the gravamen of the Complaint: a claim that the Ordinance violates the First

Amendment to the Constitution of the United States of America. Rio Rancho first argues that an

ordinance is presumed valid, and that Southwest Media "must 'overcome this presumption by

proving that the ordinance is not reasonably related to its stated purpose.'" MSJ at 4 (quoting

Temple Baptist Church, Inc. v. City of Albuquerque, 1982-NMSC-055, 98 N.M. 138, 142, 646 P.2d

565, 569). According to Rio Rancho, under New Mexico law, "although aesthetic considerations

alone are not sufficient, 'any argument against a municipality's specific police power to impose

reasonable controls for aesthetic purposes is doubtful.'" MSJ at 4 (quoting Temple Baptist Church

v. City of Albuquerque, 98 N.M. at 142, 946 P.2d at 569). Rio Rancho contends that, because "the

Ordinance does not prohibit speech altogether, the narrow issue is whether it places legitimate time,

place, and manner restrictions on speech." MSJ at 4. Rio Rancho submits that the Ordinance does

not foreclose any channels of communication; that "a 'sign ordinance regulating the size, height and number of signs is reasonably related to the proper goals of aesthetics and traffic safety'"; that promoting traffic safety is a significant government interest; and that "[t]here is no need to refer to the content displayed on Plaintiff's mobile signs to justify the goal of promoting traffic safety by regulating the size of mobile signs, and the time, place and manner in which they are displayed." MSJ at 5.

Rio Rancho also contends that Southwest Media fails to state an equal-protection claim. See MSJ at 6. In its view, under New Mexico law, the Court should apply rational-basis review to the asserted equal-protection violation, because Southwest Media "does not allege that it is part of a sensitive class, and [Rio Rancho] is not aware of any state or federal court which has ruled that owners of mobile signs are among those groups subjected to societal prejudice, or systematic denial from the political process." MSJ at 9-10. Rio Rancho asserts that Southwest Media's equal-protection claim fails for the same reasons that its free-speech claim fails: because "the Ordinance creates classifications of prohibited mobile signs based on their size, and on the time, place, and manner in which they may be displayed." MSJ at 10.

Rio Rancho also addresses Southwest Media's state law claims. With respect to Southwest Media's claim that the statute conflicts with N.M. Stat. Ann. § 42A-1-34, Rio Rancho argues: (i) that Southwest Media's "summary allegation that the Ordinance" conflicts with the statute "scarcely rises to the level of labels and conclusions, and a formulaic recitation of the elements of a cause of action, which the Supreme Court [of the United States] has emphasized will not do in federal pleading and practice," MSJ at 7 (internal quotation marks and alterations omitted); and (ii) that, under New Mexico law, the statute "does not authorize payment of compensation for unlawfully erected signs,

and it is undisputed that Plaintiff displayed its mobile sign on December 3, 2012, in violation of the Ordinance," MSJ at 7 (internal quotation marks and citation omitted).  With respect to Southwest Media's taking claim, Rio Rancho argues that Southwest Media's citation is not a taking for two reasons.  First, it contends that Southwest Media's "mobile sign is unlawful under the Ordinance" and that, "[t]herefore, [it] is not entitled to compensation under Section 42A-1-34."  MSJ at 7-8. Second, according to Rio Rancho, New Mexico law provides that a regulation is not a taking if it "is: (a) reasonably related to a proper purpose; and (b) does not unreasonably deprive the property owner of all, or substantially all, of the beneficial use of his property."  MSJ at 8.  Rio Rancho asserts that New Mexico case law provides that regulations like the Ordinance are proper, and that, because Southwest Media "can continue using mobile signs by simply reducing their size and displaying them in accordance with the reasonable time, place, and manner restrictions in the Ordinance," the Ordinance does not unreasonably deprive Southwest Media of all, or substantially all, of the beneficial use of its property.  MSJ at 8.

Southwest Media states that the Ordinance targets Southwest Media alone.  See Response at 4.  Southwest Media suggests that Rio Rancho's argument that aesthetic concerns justify the Ordinance is insufficient for two reasons: (i) it does not ban certain other mobile signs, photographs of which Southwest Media attached to its Response; and (ii) it sells advertising on its "public buses and receives revenue for advertising on school buses."  Response at 4.  Southwest Media cites Temple Baptist Church, Inc. v. City of Albuquerque and argues that, although in that case, Albuquerque comprehensively revised "its sign ordinance and stated a purpose for said changes . . . [i]n this case, the City of Rio Rancho only changed sections of the original comprehensive sign ordinance that affected" Southwest Media, and "nowhere in the minutes or in

the amendment to the Ordinance provides a reason for the change." Response at 4. Moreover, Southwest Media contended that the ordinance at issue in Temple Baptist Church, Inc. v. City of Albuquerque provided a five-year period before it went into full effect, that "[t]his amortization period must be reasonable," and that "[i]n this case there was no amortization of the property of Plaintiff and [there] was a taking by the city." Response at 4. Moreover, Southwest Media submits that the facts warrant an evidentiary hearing. See Response at 4.

With respect to its equal-protection claim, Southwest Media also contends that it "was the sole provider of these signs in" Rio Rancho. Response at 5. It points to Mobile Sign Inc. v. Town of Brookhaven, 670 F. Supp. 68 (E.D.N.Y. 1987)(Nickerson, J.), and suggests that, in that case, the court "had originally ruled [that a] sign ordinance was unconstitutional because it 'completely prohibited all mobile signs in the town.'" Response at 5 (quoting Mobile Sign, Inc. v. Town of Brookhaven, 670 F. Supp. at 70). According to Southwest Media: "Thereafter, the town revised the code and the court found the revised version Constitutional. The testimony in that case is very similar to the evidence that will be presented by Plaintiff as to its type of signs." Response at 5-6.

Southwest Media also asserts that, under New Mexico's statutory law, "Rio Rancho cannot remove the Plaintiff's signs without paying compensation." Response at 5 (citing N.M. Stat. Ann. § 42A-1-34 and Battaglini v. Town of Red River, 1983-NMSC-067, 100 N.M. 287, 669 P.2d 1082). Southwest Media points out that "[t]he statute does not limit itself to permanent signs but rather refers to 'any outdoor sign[.']" Response at 5. Southwest Media states that it

> purchased numerous signs based on the prior Ordinance. These signs were located throughout the city and were used mostly for businesses for special events. These signs fall within the type of signs protected by the statute. The signs were lawful under the prior ordinance and are now unlawful for no reasonable reason.

> Defendant somehow believes these metal signs can somehow be changed in size without providing any factual basis for such a claim.

Response at 5.

The theme of the Defendant's Consolidated Reply to its Motion for Summary Judgment and Memorandum in Support [sic], filed September 9, 2013 (Doc. 19)("Reply"), is that Southwest Media "tries to avoid summary judgment with sham factual disputes, fails to satisfy its burden of overcoming the Ordinance's presumed validity, fails to engage Defendant's arguments on the alleged conflict with Section 42A-1-34 and on equal protection, and fails to state a taking claim."  Reply at 1.  Rio Rancho submits that Southwest Media has effectively conceded four facts: that the Ordinance was amended to reflect the content Rio Rancho stated in its MSJ, that Southwest Media's president was cited for violating the Ordinance, that the president was present at meetings about the Ordinance and commented on it, and that Rio Rancho does not need to respond to Southwest Media's "additional factual allegations."  Reply at 4 (internal quotation marks omitted).  Moreover, Rio Rancho says that Southwest Media "generates sham factual disputes with an affidavit containing false averments, some of which are supported by unauthenticated photocopies of photographs, and with the contentions of counsel, which cannot defeat summary judgment." Reply at 4.  Rio Rancho also states that Southwest Media has created "sham disputes," because it is "false" that "'[t]he discussion for the business community [1] was ignored and [2] was targeted at Plaintiff'."  Reply at 4 (quoting Response ¶ 2, at 2).  Rio Rancho says that Varner was present at the meeting where the Ordinance was amended, that the City Council and the Mayor "considered how several businesses including Plaintiff might be affected by the amendments," and that "[t]he discussion ranged beyond concrete examples to numerous hypotheticals related to commercial and political advertising."

Reply at 4 (citing Transcript of Rio Rancho City Council Meeting, taken September 26, 2012, filed September 9, 2013 (Doc. 18-1)("City Council Meeting Tr."). Rio Rancho contends that Southwest Media concedes Rio Rancho's construal of the Ordinance -- that is, that it does "not prohibit the use of mobile signs or the placement of temporary signs on private property in commercial zones," but only restricts "the size of such signs, and the time, place, and manner in which they may be displayed" -- and argues that Southwest Media's additional statement "that the Ordinance would prohibit any mobile billboard that violated its provisions does not create a genuine factual dispute regarding the specific provisions."  Reply at 5.  Moreover, in Rio Rancho's view, "replacing the neutral verb 'prohibits' with 'targets' -- a verb that assumes the intent that Plaintiff tries to prove with false averments . . . -- and summarily proclaiming the Ordinance 'unreasonable' cannot transform the contentions of counsel into facts supported by admissible evidence, which are required to create a *genuine* issue of material fact."  Reply at 5 (emphasis in original)(selected internal quotation marks omitted).

Rio Rancho contends that the Court should disregard Southwest Media's assertion that it "never presented any reason for the restrictions on the mobile signs" for two reasons: (i) Rio Rancho has no burden to negate the existence of that fact, and needs only to point out that the opposing party's case lacks evidentiary support; and (ii) the assertion is false, as a video recording of the debate that records discussion of the Ordinance and its purposes demonstrates.  Reply at 5-6.  In its view, Southwest Media's "false averments cannot create a genuine dispute."  Reply at 6.

Rio Rancho states that Southwest Media's statement in its Response that the number of traffic fatalities in the city is irrelevant, because Rio Rancho "has no evidence that any of Plaintiff's signs ever affected traffic or public safety," Response at 2, is an unsupported argument of counsel,

and thus cannot create a genuine issue of material fact.  Reply at 7.  Moreover, in Rio Rancho's view,

the dispute is immaterial,

> because the law controlling Plaintiff's claim does not turn on evidence that his mobile billboards affected traffic or public safety.  Instead, the court requires Plaintiff to defeat the presumption that the Ordinance is valid, and the New Mexico Supreme Court has held that "regulating the size, height and number of signs *is reasonably related to* the proper goals of aesthetics *and traffic safety*."  Temple Baptist Church[, Inc. v. City of Albuquerque, 98 N.M. at 142, 646 P.2d at 569].

Reply at 7 (emphasis in original).

With respect to the Plaintiff's view that Rio Rancho "targeted" Southwest Media because of

its political speech, Rio Rancho submits that Varner's affidavit does not support this statement and

that it "contains false averments."  Reply at 8.  Rio Rancho states that the Ordinance was adopted

after public meetings that Varner attended, and that, contrary to Varner's statement that he was cited

on the day of the election,

> neither Varner nor Southwest Media Mobile was cited on that date; instead, Michael Williams[16] was cited; (ii) the mobile billboard did not display Varner's political speech; it displayed candidate Williams' campaign message; (iii) the reasons for issuing the citation were that Williams displayed the mobile billboard longer than the interval allowed under the Ordinance, and then refused to move the billboard to avoid being cited; and (iv) the officer who issued the citation had no idea who had called police to dispatch the officer.

Reply at 8.  Rio Rancho asserts that, "instead of supporting [this] allegation with sworn testimony

based on Varner's personal knowledge, Plaintiff presents an affidavit containing false averments

crafted to make colorable yet another baseless contention."  Reply at 8-9.  Moreover, Rio Rancho

contends that Southwest Media's assertion that it is the only provider of mobile signs in Rio Rancho

---

[16] Michael Williams appears to have been an incumbent member of the City Council.  See Affidavit of Holcey C. Wilkins (executed August 22, 2013), filed September 9, 2013 (Doc. 18-1). The parties do not otherwise elaborate on Williams' relationship to the litigation.

is immaterial, "because the cases controlling Plaintiff's claims do not turn on whether the owner of mobile signs is headquartered within the geopolitical boundaries of the municipality subjecting those signs to regulation."  Reply at 9.

With respect to Southwest Media's statements regarding those signs that the Ordinance allows, Rio Rancho asserts that the notions that the Ordinance "targets only" Southwest Media's signs and permits others is a mere truism, given that the Ordinance would prohibit anything that violates it and would allow anything that does not violate it, and that it is merely an argument of "counsel disguised as a factual allegation."   Reply at 9-10.  Rio Rancho also points out that Southwest Media cannot simultaneously maintain that traffic safety is irrelevant, then "rely on that same criterion to make [its] mobile billboards appear more legitimate than other, purported larger mobile billboards." Reply at 10.  Rio Rancho submits that "Varner knows that the plain language of the Ordinance distinguishes between his mobile billboards and commercial vehicle signs, because that was repeatedly analyzed, largely for his benefit, during the City Council meeting."  Reply at 10. Rio Rancho states that all of the photographs to which Varner's affidavit refers are "[a]pt examples of commercial vehicle signs," as distinguished from mobile billboards, and argues that Varner understood that distinction "long before he attached his affidavit to Plaintiff's Response," and that, if those photographs "depict the 'other mobile signs' to which Plaintiff refers in the Verified Complaint, then Varner knew or should have known at that time that he filed this lawsuits that the 'other mobile signs' . . . were in fact 'commercial vehicle signs' under the Ordinance."  Reply at 11. Rio Rancho also objects to the photographs' authenticity, noting that

> Varner does not swear that he personally took the photographs depicted in the photocopies; he does not swear that the photographs were taken after the amendments to the Ordinance were signed into law by the Mayor on October 1, 2012;

and he does not swear that they were all taken within the boundaries of Rio Rancho. Reply at 12.  Rio Rancho submits that the photographs are "pure speculation," and, at best, that they are double hearsay; therefore, in its view, the Court may ignore them.  Reply at 12-13.

Rio Rancho also states that Southwest Media's allegations that it is the only mobile sign company in Rio Rancho, that many businesses use its signs, and that Rio Rancho "sells advertising on [its] public transportation buses and receives revenue from advertising on the local school buses" are irrelevant to Southwest Media's claims, "save possibly for its equal protection claim, which fails as a matter of law."  Reply at 14.  It notes that Varner did not identify the "numerous businesses" or "special events" of which  he speaks in his affidavit.  Reply at 14 (quoting Varner Aff. ¶ 14, at 3). Rio Rancho points out that Varner "offers no evidence to show that he has personal knowledge of" his allegations related to Rio Rancho's advertising practices and argues that they are not properly considered facts, but are, instead, "mere conclusory allegations."  Reply at 14.  Rio Rancho also asserts that Southwest Media's allegation that the Ordinance as amended "make[s] Southwest's signs worthless" is "not a fact at all, but merely an argument of Plaintiff's counsel disguised as a factual allegation, which cannot be used to defeat summary judgment."  Reply at 15.

Rio Rancho submits that the only remaining facts merely describe Southwest Media's business, which "does not create a genuine dispute about Defendant's material facts, and it is not Defendant's burden to produce evidence negating Plaintiff's alternative factual presentation."  Reply at 14.

Rio Rancho submits that Southwest Media's assertion that Rio Rancho "nowhere in the minutes or in the amendment to the Ordinance provides a reason for the change," Response at 4, "confuses a factual dispute over whether the City advised its owner of the purposes for the

- 19 -

amendments with what Plaintiff must prove to overcome the presumption of validity," and that the statement is false. Reply at 15. Rio Rancho also asserts that the notion that Rio Rancho targeted Southwest Media because of Varner's political speech is both false and unresponsive to New Mexico law, which states "that a 'sign ordinance regulating the size, height and number of signs is reasonably related to the proper goals of aesthetics and traffic safety' and that 'the better rule is that *aesthetic considerations alone* do justify the exercise of police power." Reply at 16 (emphasis in original)(quoting Temple Baptist Church, Inc. v. City of Albuquerque, 98 N.M. at 144-45, 646 P.2d at 571-72).

Rio Rancho argues that the Ordinance does not conflict with N.M. Stat. Ann. § 42A-1-34 and that Varner's citation is not a taking under New Mexico law, substantially reiterating the arguments from its MSJ. See Reply at 16-17. Rio Rancho also points out that Southwest Media "neither alleges nor presents admissible evidence to support that Southwest Media Mobile has been unable to make money with its mobile billboards outside of Rio Rancho." Reply at 18. Rio Rancho states that "[a] citation based on an ordinance that places restrictions on the size and height of mobile signs is not a taking as a matter of law; at best, it is a legitimate time, place, and manner restriction." Reply at 19. Rio Rancho also states that Southwest Media's argument that an "amortization period" should have preceded the Ordinance suffers from three flaws: (i) "there is no reason for this Court to hear evidence going to the reasonableness of an amortization period -- which is 'a constitutional *alternative to* just compensation as a remedy for a taking claim -- where Plaintiff has failed to state the claim itself"; (ii) the Supreme Court of New Mexico in Temple Baptist Church, Inc. v. City of Albuquerque "did not find the absence of evidence related to the reasonable length of amortization sufficient to defeat summary judgment on the underlying taking"; and (iii) Southwest Media "did

not file an affidavit under Rule 56(d) establishing the need for specific, additional evidence to respond to the instant Motion.  Instead, [it] tried to defeat summary judgment with sham disputes of material fact shored up with false affidavits."  Reply at 19-20 (emphasis in original).

Rio Rancho argues that Southwest Media misconstrues the facts when it states that the Ordinance bans mobile signs altogether.  See Reply at 20.  It reiterates its view that the subject was addressed at the City Council meeting, and also states that the "Plaintiff would have received the citation regardless of the size of his mobile billboard, because he simply refused to comply with the reasonable time, place, and manner restrictions contained in the Ordinance."  Reply at 20.  Rio Rancho maintains, however, that

> [u]ltimately . . . nothing of that matters because the court in Temple Baptist Church made it clear that size and height limitations are among legitimate time, place, and manner restrictions.  Plaintiff's characterization of constitutional time, place, and manner restrictions as tantamount to a "ban" is misleading and contrary to the law controlling [its] claim.

Reply at 20.

Finally, Rio Rancho asserts that Mobile Sign Inc. v. Town of Brookhaven "does not elucidate or support Plaintiff's equal protection claim, the basis for which he never explains."  Reply at 21. Rio Rancho contends that

> the evidence that Plaintiff has presented to date to show that its mobile billboards have been treated differently from those owned by similarly situated businesses consists of immaterial facts and an affidavit containing false averments, some of which are supported by unauthenticated photocopies of photographs that are not what they purport to be.

Reply at 21.  Rio Rancho maintains that Mobile Sign Inc. v. Town of Brookhaven analyzed a First Amendment claim, not an equal-protection claim, and that, "even if Plaintiff had mustered competent evidence to resist summary judgment, Plaintiff does not explain how" Mobile Sign Inc. v.

Town of Brookhaven supports "what appears to be Plaintiff's 'class-of-one' equal protection claim." Reply at 21.

On November 12, 2013, the Court issued a Notice setting a hearing on the MSJ for November 22, 2013.  See Notice, filed November 12, 2013 (Doc. 20).

The Court held a hearing on November 22, 2013.  See Transcript of Hearing, taken November 22, 2013 ("Tr.").[17]  Southwest Media's counsel attended the hearing telephonically, because his office apparently had not scheduled the hearing on its internal calendar.  See Tr. at 1:8-19 (Court, Border)("I apologize, Your Honor[,] for missing this notice.  I don't know why I missed it.  I apologize.").  Southwest Media's counsel repeatedly qualified his answers by stating he was unprepared, and he exhibited uncertainty about the case's facts and about the claims his client brought.  See Tr. at 17:24-25 (Border)("I apologize, Your Honor, for not being quite prepared[.]"); Tr. at 41:25-42:2 (Border) ("I didn't prepare as well for obviously this hearing because I wasn't aware of it."); Tr. at 21:22-23 (Border)("I think that was some of my client's position."); Tr. at 23:1-6 ("The Court: How many of these vehicles does Southwest Media have?  Mr. Border: I think he has -- I should have -- I wish he was here.  I think he has two or three mobile signs, and then six or seven of these temporary signs that he uses for special events."); Tr. at 28:8-12 (Border)(apologizing for his lack of clarity regarding the number of signs and providing accurate numbers to the Court from Varner's affidavit); Tr. at 28:25-29:22 (Border)(stating that the primary claim is the statutory claim, but also stating that the Ordinance "violates the taking clause of both the New Mexico and U.S. Constitution"); Tr. at 29:24-30:7 (Court, Border)(stating, upon the Court's prompting, that his client

---

[17] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

asserts a First Amendment claim); Tr. at 30:22-23 (Border) (stating to the Court that the purported First Amendment claim is "probably more of an equal protection claim"); Tr. at 41:4-7 (Border)(conceding that his client does not assert a First Amendment claim); Tr. at 41:12-15 (Court, Border)(conceding that his client asserts only two federal claims: an equal-protection claim and a takings claim); see Tr. at 41:18-42:8 (Court, Border)(equivocating about whether Southwest Media asserts a traditional equal-protection claim or a class-of-one claim, but stating that "I think as I remember my research correctly just the issue of one," and stating that, unless he informed the Court otherwise, the Court could consider this to be only a class-of-one claim).  The point of this recitation is not to embarrass counsel, but simply to explain the Court's later decision to look to the Complaint for a clear recitation of the claims Southwest Media asserts, rather than to rely on counsel's representations at the hearing.

The Court pointed out that many of the cases that the briefing cites are New Mexico state court cases and asked whether such cases are relevant in federal court; Rio Rancho conceded that New Mexico state court cases do not bind the court, but argued that the New Mexico cases could nonetheless be persuasive, given that this case was removed from state court and involves Southwest Media's challenge to a local statute.  See Tr. at 3:25-5:1 (Court, Young).  Moreover, Rio Rancho submitted that it did not need to rely on state case law, because federal law also supports its decision. See Tr. at 5:1-6 (Young).  Rio Rancho argued that the Ordinance merely imposes time, place, and manner restrictions on speech.  See Tr. at 6:1-14 (Young).  The Court asked Rio Rancho to explain what the Ordinance does -- specifically, whether it requires a sign-bearing vehicle to continue moving, stopping only for lunch; Rio Rancho stated that, if a vehicle is always moving, "it isn't clear at all that the ordinance would regulate that."  Tr. at 6:15-7:4 (Court, Young).  Upon the Court's

prompting, Rio Rancho indicated that its counsel spoke to "the city attorneys for the surrounding[]

municipalities and said to [the] city attorney for Bernalillo, city attorney for Albuquerque . . . ['D]o

your respective ordinances regulate signs that are moving around[?'] And the answer I got from both

of those was no."[18]   Tr. at 7:5-24 (Court, Young).   Rio Rancho indicated that the City of

Albuquerque's similar ordinance does not "specifically regulate mobile signs, and it certainly does

not regulate a sign that is in motion"; in Rio Rancho's view, this fact is significant, because at the

meeting at which the City Council adopted the resolution, its members and

> Mayor Tom Swisstack were very concerned that . . . if a business with a fixed sign is
> regulated in certain ways, it's unfair for someone with a mobile sign to park it [--]
> and that's what happened here [--] and essentially duck some of those requirements
> that re imposed on owners of those types of signs.

Tr. at 8:4-23 (Young).   In response to the Court's probing, Rio Rancho underscored that, although

the question whether the Ordinance would regulate the movement of trucks might arise in the future,

it is not a material issue in this case; Rio Rancho stated that the concern is whether a mobile sign

remains a mobile sign when it is physically still and what the Ordinance's implications are for such a

sign.   See Tr. at 8:24-10:1 (Young, Court).   The Court asked whether Rio Rancho's ordinance

regulates signs differently than the City of Albuquerque's similar ordinance does; according to Rio

Rancho, based on its reading of its ordinance and Albuquerque's ordinance, no nearby municipality

---

[18] According to the United States Department of Commerce, as of 2012, Rio Rancho is a city of approximately 90,818 people.  See Rio Rancho (city) QuickFacts from the US Census Bureau, United States Census Bureau, http://quickfacts.census.gov/qfd/states/35/3563460.html (last visited December 30, 2013).  According to the same source, as of 2012, Albuquerque is a city of approximately 555,417 people.  See Albuquerque (city) QuickFacts from the US Census Bureau, United States Census Bureau, http://quickfacts.census.gov/qfd/states/35/3502000.html (last visited December 30, 2013).  The cities are neighboring municipalities.  See Albuquerque, New Mexico, Wikipedia.org, available at http://en.wikipedia.org/wiki/Albuquerque,_New_Mexico (last visited December 31, 2013).

regulates a sign while it is in motion.  See Tr. at 10:2-11:7 (Court, Young).  Rio Rancho underscored

that that issue is "just not a p[o]int of contention in this lawsuit."  Tr. at 11:7-8 (Young).

The Court questioned "how [Rio Rancho could] distinguish between Joe the Plumber's truck

and these other trucks."  Tr. at 11:11-16 (Court).  Rio Rancho conceded that this distinction is

important and explained:

> The ordinance explicitly and by interpretation does not regulate vehicles that are
> advertising the business that owns the truck, and the classic example is a U-Haul
> trailer, Your Honor or an Allied Moving van, you know, 30 foot long semi trailer.  If
> you're advertising your own business on your own truck it isn't regulated at all, Your
> Honor and every[ ]one of the examples that plaintiff gave you as attachments do
> precisely that.

Tr. at 11:17-12:10 (Young).  The Court asked Rio Rancho to identify the public purpose behind

"telling Southwest Media it can't advertise who it wants on its truck and another person to own the

truck," because the ownership of the truck seems to make no difference in terms of traffic safety or in

terms of aesthetics.  Tr. at 12:11-20 (Court).  Rio Rancho replied that it addressed this problem at its

City Council meeting and stated that it had an interest in minimizing the number of times in which

individuals could display such signs.  See Tr. at 12:21-11 (Young).  Rio Rancho also indicated that,

by limiting advertising to only those vehicles that the business owns and uses to conduct business,

"the extent of the advertising is on one to one correlation with the size of the business."  Tr. at 13:12-

15:5 (Young).  The Court asked what would happen if a business bought a number of trucks solely to

use as mobile advertising devices; Rio Rancho indicated that, because the Ordinance requires that the

business use it in daily or regular business for which the truck is intended, the use the Court

described "would be a clear attempt to dodge the permissive use under the ordinance, Your Honor,

and that just hasn't happened."  Tr. at 15:6-24 (Court).  Rio Rancho also stated that businesses would

not be able to afford that approach, and that, in any event, although Southwest Media is free to

pursue as many contracts as it wishes, it must "abide by the time, place, [and] manner restrictions

which have been upheld as constitutional."  Tr. at 15:25-16:17 (Young).  Moreover, Rio Rancho

pointed out, Southwest Media's usage differed substantially from the Court's hypothetical.  See Tr.

at 16:17-21 (Young).  The Court stated that "[n]o mobile advertising company is going to get a

contract with every business in town"; Rio Rancho replied that case law provides that it merely needs

to "show that [the Ordinance] is reasonably related to the purposes of the ordinance[,] and courts

over and over again in this state and around the country have said . . . that traffic safety and aesthetics

even standing alone in the case of aesthetics are sufficient."  Tr. at 16:22-17:16 (Court, Young).

Southwest Media reframed the issue by stating that the Ordinance targets only the signs that

Southwest Media makes, and asserted that its signs are no more intrusive than those that the

Ordinance allows.  See Tr. at 17:24-18:16 (Border).  Southwest Media stated that there is no rational

distinction between those signs that the Ordinance permits -- for example, signs on the side of parked

semi-trailer trucks -- and the signs that it prohibits -- Southwest Media's mobile signs.  See Tr. at

18:81-25 (Border).  Southwest Media asserted that "the state claim is really based upon the sign

status in the State of New Mexico" and confirmed that it filed the case in state court, from which Rio

Rancho removed it.  Tr. at 19:1-9 (Border, Court).  Southwest Media conceded that Rio Rancho can

broadly "regulate signage for aesthetic and safety purposes," and argued that a prior ordinance had

reflected that intent in imposing placement and duration requirements.  Tr. at 19:10-22 (Court,

Border).  Southwest Media asserted that, when an election was held, "Southwest Media was caught

up in [a] controversy, and so now . . . the regulations were changed to specifically target the sign that

Southwest Mobile had in terms of limiting their signage or those temporary signs, and also their

mobile signs." Tr. at 19:22-20:3 (Border).  Southwest Media confirmed that it disagrees with Rio Rancho's contention that the ordinance does not regulate the signs as long as they are moving, because, in practice, it would be very difficult to have a mobile sign: for example, it points out that, "unlike the other trucks that can be parked for hours at a time . . . , they're limiting to one hour at lunch.  So someone couldn't even stop and go to the bathroom . . . ." Tr. at 20:8-19 (Court, Border). Southwest Media states that, in operation, the Ordinance "severely limits and has severely limited [it] from having [its] signs at least on a mobile platform."  Tr. at 21:5-8 (Border).  On the Court's inquiry, Southwest Media conceded that the Court could "ignore for purposes of this case[] all the problems that may exist in your client's mind with the regulation as far as movement" and focus solely on trouble with it being parked.  Tr. at 21:9-22 (Court, Border).

Southwest Media further emphasized that the mobile signs are less significant to its claims than the concerns about its temporary signs for particular events: "For example, the Ford dealership would have an event and advertise for a week or two weeks.  This prevents [Southwest Media's] signs from being displayed, [a]nd only [its signs] from being displayed at special events like this." Tr. at 21:23-22:7 (Border).  Southwest Media confirmed that a car dealership could advertise using its own vehicle, but could not contract with Southwest Media to do so.  See Tr. at 22:8-14 (Court, Border).  Southwest Media alleged that it has been cited for a similar activity and that, although the citation "was actually dismissed . . . [, it will] be cited again if [it] puts up any more of these signs." Tr. at 22:15-25 (Court, Border).

Southwest Media's counsel stated that Southwest Media owns "two or three mobile signs, and then six or seven of these temporary signs that [it] uses for special events." Tr. at 23:1-6 (Court, Border).  Southwest Media later stated that it is unable to use "14 signs measuring eight foot to 20

feet by 11 feet by 23 feet." Tr. at 28:10-12 (Border).   Southwest Media confirmed that it used the

phrase "mobile sign" to refer to a sign mounted on a truck that has changeable lettering, and that it

would drive the signs "except when [the truck driver] stops for lunch, breaks, those kind of things."

Tr. at 23:10-24:4 (Border, Court).   Southwest Media stated that it can create a second sign that it can

take to a business, to be used either on small trailer or on a frame at the business.   See Tr. at 24:4-8

(Border).  Southwest Media clarified that it challenges the Ordinance as it applies to both temporary

signs and mobile signs: it believes that it cannot use "mobile signs because [it] cannot park them in

any[ ]place other than a storage unit, which is too far from civilization" -- that is, because it "can't

stop anywhere, [the signs] become very useless" --  and that it cannot use temporary sings because

the city has "limited the size of the sign to such an extent and other regulations that those signs

cannot be used."  Tr. at 24:9-25 (Court, Border).   Southwest Media further clarified that "the

temporary sign is on a trailer that is part at the business that obviously hires [it] to advertise [the

business'] event" and stated that the Ordinance would ban its signs, because its signs exceed the

Ordinance's size restrictions.  Tr. at 25:1-20 (Court, Border).  Southwest Media stated that it had

smaller signs it could use, but that the Ordinance prohibited it from using its large signs, and

maintained that its smaller "signs are so small that we don't believe that any business would want it,"

because "people can't even read it."  Tr. at 25:24-26:11 (Border, Court).  Southwest Media indicated

that the disparities between the signs that the Ordinance permits -- for example, large signs on the

side of a parked truck that a company owns -- and the smaller signs that the Ordinance prohibits --

the smaller signs that Southwest Media owns -- indicate that the Ordinance "is unconstitutional, it is

tailored specifically to one business, and one business only, that being Southwest Media Mobile."

Tr. at 26:15-27:2 (Border).

Upon the Court's inquiry, Southwest Media clarified the circumstances of the election to which its Complaint alludes: it contended that it had provided advertising media for the losers in a local election, and stated that its representative was cited the day of the election, and that its involvement "is the basis of why these signs are now being targeted by the current council." Tr. at 27:3-16 (Court, Border). The Court stated that it did not understand why election winners would target the advertising medium that their opponents had used, rather than simply using the same medium; moreover, the Court asked whether that backdrop is irrelevant to its decision. See Tr. at 27:17-28:3 (Court, Border). Southwest Media conceded that the Court does not need to consider any allegations that Rio Rancho targeted it for its political expression, but emphasized that it is "the only business in the City of Rio Rancho that this new sign ordinance effects." Tr. at 28:13-21 (Court, Border).

The Court asked Southwest Media to clarify the claims it has brought against Rio Rancho. See Tr. at 28:25-4 (Court). Southwest Media stated that the main claim arises under New Mexico statutory law, but stated that it believes the Ordinance "also violates the taking clause of both the New Mexico and U.S. Constitution." Tr. at 29:5-17 (Court, Border). The Court asked whether this case presents a First Amendment claim or an equal-protection claim. See Tr. at 29:24-21 (Court, Border). Although Southwest Media briefly expressed the view that it raised a First Amendment claim, see Tr. at 30:1-19 (Border, Court), it later conceded that the claim is properly considered as an equal-protection claim, see Tr. at 30:22-31:1 (Border). Southwest Media would later expressly concede that it does not assert a First Amendment Claim, and stated that the only two federal claims in the case are an alleged violation of the Equal Protection Clause of the Fourteenth Amendment and an alleged violation of the Takings Clause of the Fifth Amendment. See Tr. at 40:25-41:15 (Court,

Young, Border).  The Court asked whether Southwest Media had considered if the case is more of a state-law case rather than a federal-law case; Southwest Media confirmed that it had considered eliminating the federal claims and having the Court remand the case, but stated that "one of the reasons [it] didn't do that was [it] thought [the case] probably could be heard faster in Federal Court than in Sandoval County," because that court is "so backed up."  Tr. at 21:2-14 (Court, Border).

Rio Rancho stated that Southwest Media mischaracterizes the Ordinance in several ways.  In its view: (i) the Ordinance allows drivers to take breaks, because it allows drivers an hour-long break at lunch; (ii) it is not true to say that Southwest Media will be cited as soon as its vehicles park, because Rio Rancho's officers have stated "we never cite people without giving them [an] opportunity to move on"; (iii) the single citation to which Southwest Media points arose, not because of its involvement in any political controversy, but because its truck "parked in front of a restaurant and . . . left it there beyond the hours of the business," and, moreover, the officer asked the driver to move the truck, and the driver "said ['] no I want the citation.[']"; (iv) the size ordinances that apply to temporary signs vary in a manner sensitive to safety concerns; and (v) political signs are permitted on private property, with no size restrictions.  Tr. at 32:6-34:16 (Young, Court).  Rio Rancho contended that, even if Southwest Media believes the case raises First Amendment claims, it neither pled a First Amendment case nor alleged facts to support it.  See Tr. at 34:21-35:5 (Young).

Upon the Court's inquiry, Southwest Media agreed that the Ordinance is content neutral.  See Tr. at 35:6-9 (Court, Border).  The Court asked Southwest Media to identify a genuine issue of material fact; Southwest Media indicated that, with the exception of any damages calculation, there are no such issues, and that the Court could decide whether the Ordinance violates the Constitution using only the facts before it.  See Tr. at 36:9-37:1 (Court, Border).

Rio Rancho replied that Southwest Media's statement was confusing: in Rio Rancho's view, although it is Southwest Media's prerogative to concede any factual disputes, Rio Rancho had identified a number of sham disputes based on "materially false" affidavit averments that Southwest Media had attached to its Response.  Tr. at 37:3-14 (Young).  For example, Rio Rancho contended that the vehicles which Southwest Media states are similar to its vehicles "are[,] every one of them[,] vehicles used in the course of the business for which they are intended," and are thus "not mobile signs under the ordinance."  Tr. at 37:16-23 (Young).  Rio Rancho qualified this statement by acknowledging that the owners of one such vehicle did not respond to him, but asserted that it was readily apparent that the vehicle was a truck used for business.  See Tr. at 37:23-38:9 (Young).  Rio Rancho complained that Southwest Media's affidavit "repeatedly asserts false facts": for example, Rio Rancho contends that Southwest Media's owner was not cited in response to his political message, but because he violated the law.  Tr. at 38:11-20 (Young).  Further, Rio Rancho asserts that the police officers did not immediately cite him, but instead asked him to move the truck, and he refused, telling them to cite him.  See Tr. at 38:20-22 (Young).  Rio Rancho expressed its exasperation at having to seek a page extension and expend resources responding to what, it believes, are sham issues.  See Tr. at 38:23-39:15 (Young).  Further, Rio Rancho asserted that the notion that it is targeting Southwest Media is false; rather, "the fact of the matter is other people aren't violating the ordinance," and that "he's the only one who apparently has a business that is incorporated in the City of Rio Rancho" is "irrelevant under the law . . . ."  Tr. at 39:18-24 (Young).  In Rio Rancho's telling, Southwest Media alone "flouts" the Ordinance, and Southwest Media has provided no contrary evidence.  Tr. at 39:25-20 (Young).

The Court then turned the parties' attention to the existing claims.  The Court confirmed that

the only two federal claims in the case are an equal-protection claim and a takings claim.  See Tr. at

41:12-15 (Court, Border).   Upon the Court's inquiry, Southwest Media stated that its equal-

protection claim is not a traditional equal-protection claim, but rather a class-of-one claim.  See Tr. at

41:18-42:8 (Court, Border).   Rio Rancho asserted that it understood that the Court would apply

rational-basis review; the Court stated that rational-basis scrutiny is a concept more associated with

traditional equal-protection claims than with class-of-one claims, so the analysis may differ.  See Tr.

at 42:10-20 (Young, Court).   Rio Rancho asserted that Southwest Media provided "no facts

whatsoever that are truthful and supported by admissible evidence" to support its allegation of

animus.  Tr. at 42:24-43:7 (Young).   The Court asked Rio Rancho if the Court could conclude that

there was no evidence of animus at the summary-judgment stage;   Rio Rancho asserted that

Southwest Media's burden was to show "illegal discriminatory intent or illegitimate motive, malice,

ill[ ]will, that sort of thing," and stated that all allegations in the affidavits regarding that issue are

false.  Tr. at 43:21-44:20 (Court, Young).   In response to Rio Rancho's question whether the Court

would apply rational-basis review, the Court underscored that the test for a class-of-one case may be

different than the traditional rational-basis test, but indicated that it would consider the issue in more

detail.  See Tr. at 44:20-45:10 (Young, Court).   Rio Rancho pointed the Court to the Tenth Circuit's

decision in Jennings v. City of Stillwater, 383 F.3d 1199 (10th Cir. 2004)(McConnell, J.), and argued

that Southwest Media asks the Court to become what Jennings v. City of Stillwater proscribes: "a

zoning board of appeal."  Tr. at 45:11-21 (Young).   Rio Rancho underscored its view that Southwest

Media "tries to generate the appearance of an illegitimate motive and malice" with "false

averments," and, moreover, that it has failed to show that the Ordinance lacks rational support,

because both traffic-safety and aesthetic considerations justify it.  See Tr. at 45:21-47:2 (Young).  In

Rio Rancho's view, there is no evidence of animus, and Southwest Media cannot show that the Ordinance "was enacted without any conceivable basis other than a wholly illegitimate motive." Tr. at 47:2-23 (Young). Rio Rancho maintained that Southwest Media has failed to show that any of its actions "were both wholly arbitrary and lacking in legitimate justification," as Jennings v. City of Stillwater requires, or "that similarly situated persons were treated differently." Tr. at 48:11-49:1 (Young).

Southwest Media responded that its "entire argument is that [its] signs are not different than these other signs that are being allowed." Tr. at 49:17-20 (Border). It stated that this violates the Equal Protection Clause, because it "essentially" prohibits all mobile signs, thereby rendering their signs unusable. Tr. at 48:24-50:10 (Border)(citing Mobile Sign, Inc. v. Town of Brookhaven). Upon the Court's inquiry, Southwest Media stated that, because it is the only business that the Ordinance affects, that apparent targeting gives rise to animus "in and of itself." Tr. at 50:11-51:4 (Court, Border). Southwest Media conceded, however, that this characterization may be more appropriately considered as it relates to its takings claim and not to its equal-protection claim. See Tr. at 50:24-51:3 (Border). The Court asked whether the United States Congress' practice of passing special legislation could be unconstitutional in the absence of evidence of animus; Southwest Media contended that this case differs, because the transcript of the City Council hearing demonstrates that Southwest Media notified the City Council that only his business would be affected, and that, therefore, it is clear "from the transcript of these City Council hearings that his is the only business being targeted." Tr. at 51:7-52:9 (Court, Border).

Rio Rancho began its rebuttal by stating that Southwest Media lacks any precedential support for its equal-protection claim; for example, it noted that the sole case that Southwest Media cites,

- 33 -

Mobile Sign, Inc. v. Town of Brookhaven, is a First Amendment content-restriction case and not an equal-protection case.  See Tr. at 52:15-53:1 (Young).  Further, Rio Rancho underscored that Southwest Media has made false factual assertions and that it cannot prove the animus element of his equal-protection claim.  See Tr. at 53:2-8 (Young).

Rio Rancho then turned to the federal takings claim and stated that Southwest Media lacks a takings claim, arguing that it cannot be the case that owners of mobile signs may defeat time, place, and manner restrictions by raising a takings claim.  See Tr. at 53:12-54:9 (Young).  According to Rio Rancho, the Ordinance is not a taking, because it is reasonably related to a proper purpose, and it does not unreasonably deprive Southwest Media of all or substantially all beneficial use of its signs.  See Tr. at 55:9-24 (Young).  Rio Rancho asserted that the law does not require it to demonstrate that Southwest Media's signs caused traffic accidents to substantiate its claim that the Ordinance is reasonably related to the public-safety purpose that it identifies, and, moreover, it contended that Southwest Media can alter its signs to comply with the Ordinance without difficulty.  See Tr. at 55:12-56:9 (Young).  Rio Rancho emphasized that the law requires that such a deprivation be unreasonable and suggested that any deprivation that the Ordinance causes is not unreasonable.  See Tr. at 56:10-15 (Young).  Rio Rancho argued that the Ordinance does not deprive Southwest Media of all beneficial use of the property, because Southwest Media could use its property if it complied with the Ordinance; Rio Rancho states that Southwest Media does not wish comply, because it would increase its business costs to employ individuals "to be there to move [the signs] when asked to do so and so forth[.]"  Tr. at 56:16-24 (Young).  Rio Rancho also contended that the Ordinance cannot deprive Southwest Media of all beneficial use of its property, because nearby larger communities impose similar regulations.  See Tr. at 56:24-10 (Young).  In sum, in its view, "[t]here

hasn't been a taking . . . .  There has been a citation[, because Southwest Media] violated these restrictions."  Tr. at 57:10-12 (Young).

Southwest Media stated that its "brief was more related to the state claim" than the federal taking claim; it pointed out that it "didn't cite any federal claims," but instead based its claim on state law.  Tr. at 57:16-19 (Border).  Southwest Media suggested that the standards overlap.  See Tr. at 57:19-22 (Border).  Southwest Media repeated its argument that Rio Rancho allows other similar signs and asserted that Southwest Media relied on a prior sign ordinance, arguing that Rio Rancho should not have "change[d] that sign ordinance without giving him at least a reasonable period of time."  Tr. at 58:1-5 (Border).

Rio Rancho stated that the Supreme Court has held that, "if the regulation simply prohibits the use of property for purposes declared to be injuri[ous] to health[,] morals[,] or safety of the community that prohibition cannot be a taking."  Tr. at 58:13-21 (Young)(citing Goldblatt v. Hempstead, 369 U.S. 590 (1962)).  Rio Rancho also submitted that any of Southwest Media's arguments that turn on whether the Ordinance affects only its vehicles properly belong in the equal-protection analysis and not in a taking analysis.  See Tr. at 59:1-15 (Young).  Rio Rancho argued that Southwest Media could work in Albuquerque without violating any of that city's ordinances.  See Tr. at 59:17-23 (Young).  The Court asked if the state taking claim differed from the federal taking claim; Rio Rancho asserted that they did, but did not fully explain that difference.  See Tr. at 60:1-10 (Court, Young).  Rio Rancho reemphasized its points that: (i) aesthetics concerns alone justify the Ordinance; and (ii) the Ordinance is not targeted only at Southwest Media.  See Tr. at 60:12-61:10 (Young).  With respect to the targeting concern, Rio Rancho pointed to the transcript of the City Council hearing, at which the participants considered how the Ordinance would affect a number of

- 35 -

different entities other than Southwest Media -- for example, signs related to political campaigns, and signs that advertise parks and monuments.  See Tr. at 60:21-61:10 (Young)("[T]he obvious thin[g] there [--] I don't know how you miss it [--] is they're concerned with all kinds of businesses[.]").

Southwest Media declined to comment on the state-law taking claim.  See Tr. at 61:25-62:3 (Court, Border).

The parties then discussed whether the Court should remand the state claims if it grants summary judgment with respect to the federal claims; the Court indicated that, if it dismisses the federal claims, it would remand the state claims, because "the Tenth Circuit has been pretty demanding that that take place." Tr. at 62:6-11 (Young, Court).  Rio Rancho indicated that the state taking claim would present the same concerns as the federal taking claim, so it was "not sure what would be remanded[.]" Tr. at 63:14-20 (Young).  The Court said it would remand any state claims, including the taking claim and the statutory claim; Rio Rancho indicated that the remaining state-law questions are straightforward and argued that the Court is fully able to resolve them.  See Tr. at 62:21-64:13 (Court, Young).

The Court indicated that it was inclined to grant the MSJ in part and remand the state claims. See Tr. at 64:18-65:10 (Court).  The Court indicated that the standards that govern both a class-of-one claim and an equal-protection claim are too demanding for Southwest Media's claims to survive. See Tr. at 64:18-65:2 (Court).  Southwest Media confirmed that the only two federal claims in the case are the class-of-one claim and a federal taking claim, and the Court indicated that it was "inclined to grant the motion on those two and then remand the state claims back to state court.  But [said it would] take this under advisement." Tr. at 66:1-12 (Court, Border).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Schs., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at *23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[19]   Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

---

[19] Although the Hon. William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v.

Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified-immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 547, 586–587 (1986)(footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81.

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different

stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir.2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir.2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312. "The Tenth Circuit, in Rhoads v. Miller, explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M.2010)(Browning, J.) (citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility.... Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395–96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x 289, 291–92 (10th Cir.2009)(unpublished) [20](internal quotation

---

[20] Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

marks omitted).  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249–50 (quoting Rhoads v. Miller, 352 F. App'x at 291–92).  In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326–27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

### LAW REGARDING EQUAL-PROTECTION CLASS-OF-ONE CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no states shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). See Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1233 (10th Cir. 2009)("Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'")(quoting City of Cleburne v.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Marino v. Mavger, 118 F. App'x 393 (10th Cir. 2004)(unpublished), and Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum

Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).

### 1.        The Substantive Law of Class-of-One Claims.

The Supreme Court has "recognized successful equal protection claims brought by a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Willowbrook v. Olech, 528 U.S. 562, 564 (2000). The classic "class of one" case is one in which a public official inflicts or imposes a burden or cost of some sort on one person or entity without imposing the same burden or cost on other similarly situated persons or entities.  See Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005).

Class-of-one cases have presented a challenge to the lower courts since the Supreme Court established the doctrine in Willowbrook v. Olech.  See Jennings v. City of Stillwater, 383 F.3d 1199, 1211 (10th Cir. 2004). The lower courts have recognized the risk that, "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." Jennings v. City of Stillwater, 383 F.3d at 1211–12.  The Tenth Circuit recognized in Jennings v. City of Stillwater that it is nearly always possible for persons aggrieved by a government action to produce evidence of being treated differently than others and that it is always possible to allege such differential treatment.  See Jennings v. City of Stillwater, 383 F.3d at 1211-12.

Recognizing the potentially unlimited nature of the claim, the circuits have "proceeded cautiously in applying this theory." Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1209 (10th Cir. 2006)(McConnell, J.). The Tenth Circuit in Jicarilla Apache Nation v. Rio Arriba

_____

Opinion and Order.

County cautioned that "[a]n approach that reads Olech too broadly could transform the federal courts into general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system." Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d at 1209 (citing Jennings v. City of Stillwater)(internal quotation marks omitted).

> In keeping with these concerns, the Tenth Circuit recently explained that

> [t]o prevail on [the class-of-one] theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently.  Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d[ at 1210].  A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive," id. at 1211, and "wholly unrelated to any legitimate state activity," Mimics, Inc.[ v. Vill. of Angel Fire, 394 F.3d 836, 849 (10th Cir. 2005)] (quotation omitted). This standard is objective -- if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations. Jicarilla Apache Nation, 440 F.3d at 1211.

Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1216 (10th Cir. 2011).[21]

---

[21] There appears to have been some confusion regarding whether the Tenth Circuit requires a plaintiff to allege some degree of animus as well.  Although earlier Tenth Circuit opinions suggested that a plaintiff must prove some degree of animus, see Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 849 (stating that plaintiffs "must prove that they were singled out for persecution due to some animosity" (internal quotation marks omitted)), the Tenth Circuit subsequently treated the issue as an open question, see Jicarilla Apache Nation v. Rio Arriba Cnty., 440 F.3d at 1209-10, and the quoted language from Kansas Penn Gaming, LLC v. Collins supports an objective standard -- not an inquiry into subjective culpability.  As the Honorable John E. Dowdell, United States District Judge for the District of Oklahoma, recently stated when considering a motion to dismiss for failure to state a claim under rule 12(b)(6):

> [T]he Collins court omitted the animosity language found in Mimics and reiterated that the standard is an *objective* one. Given the Collins court's emphasis on the "objective" nature of the inquiry, and the logic thereof, the Court declines to impose a requirement that the plaintiffs make a showing of ill will or animosity . . . .

Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cnty., Okla.. No. 12-CV-636-JED-PJC, 2013 WL 1975644, at *5 n.3 (D. Okla. May 13, 2013)(Dowdell, J.)(emphasis in original).  The Court

The Tenth Circuit has noted: "'The paradigmatic 'class of one' case, sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen.'" Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (internal alteration omitted)(quoting Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005)). "Successful claims have arisen from unfavorable zoning decisions, withholding of permits, and selective regulatory enforcement." Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (internal citations omitted). The Supreme Court has also held that "the class-of-one theory of equal protection has no application in the public employment context. " Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607-08 (2008)(reasoning that "an allegation of arbitrary differential treatment could be made in nearly every instance" of a personnel decision by the government and that "government offices could not function if every employment decision became a constitutional matter"). See Kelley v. City of Albuquerque, 542 F.3d 802, 821 (10th Cir. 2008)( "[T]he class-of-one theory is not legally cognizable where . . . a public employee claims that she has been treated differently than other employees."); Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2105955, at *5 (D.N.M. June 22, 2009)(Browning, J.)("In this case, Duprey, who is a public employee, is alleging that she was denied a promotion and was demoted. Because her lawsuit arises in the public-employee context, she cannot

---

acknowledges its past statement that "[t]o show a constitutional violation under the 'class of one' theory," the plaintiff must prove "that the Defendants acted with discriminatory intent" in Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1205 (D. N. M. 2004)(Browning, J.). That statement preceded both Jicarilla Apache Nation v. Rio Arriba County and Kansas Penn Gaming, LLC v. Collins, and the Court agrees with Judge Dowdell's description of the Tenth Circuit's evolution in this regard. The Court will not, therefore, require a showing of animosity to sustain a class-of-one claim.

proceed on the class-of-one theory.").

2.      **The Similarly Situated Individual Pleading Requirement for Class-of-One Claims or Claims Based on membership in a Non-Protected Class.**

"Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens." Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1215-16.  A plaintiff alleging disparate-treatment discrimination based on membership in a non-protected class or in a class of one must therefore allege in the complaint that similarly situated persons were treated differently.  See Brown v. Montoya, 662 F.3d 1152, 1173 (10th Cir. 2011)("The pleading requirement of an allegation that a similarly situated person was treated differently applies both when the plaintiff challenges a government action that discriminates based on membership in a non-protected class, or membership in a 'class of one.'")(internal citations omitted)(citing Price-Cornelison v. Brooks, 524 F.3d 1103, 1120 (10th Cir. 2008)); Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1216).  As the Supreme Court set forth in Village of Willowbrook v. Olech, a plaintiff may bring a class-of-one equal-protection claim, alleging that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564 (citing Sioux City Bridge Co. v. Dakota Cnty., 260 U.S. 441 (1923); Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty., 488 U.S. 336 (1989)).  Similarly, discrimination against members of a non-protected class, such as White-Anglos, violates equal protection.  See McDonald v. Santa Fe. Trail Transp. Co., 427 U.S. 273, 279-80 (1976)(holding that Title VII "proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites."); Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C., 462 U.S. 669, 676 (1983)(extending this proposition to Equal Protection Clause

- 46 -

violations); <u>Reynolds v. Sch. Dist. No. 1, Denver</u>, 69 F.3d 1523, 1532 & n.10 (10th Cir. 1995)(recognizing that the Equal Protection Clause proscribes discrimination against White-Anglos).

The law of equal protection traditionally deals with "groups unified by the characteristic alleged to be the root of the discrimination." <u>Jennings v. City of Stillwater</u>, 383 F.3d at 1213. Where a group is involved, the problem is simplified; in this traditional situation, "the sample size is large enough to raise a concern that the disfavored class was selected . . . because of their membership in the class." <u>Jennings v. City of Stillwater</u>, 383 F.3d at 1213. A unique feature of the class-of-one claim is that it essentially exempts plaintiffs from proving membership in one of these groups; rather, they need prove only that he or she is "similarly situated" to other individuals or entities who have been treated more favorably.  Addressing this unique characteristic of these claims, the Tenth Circuit in <u>Jennings v. City of Stillwater</u> noted that "[i]t is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class."  383 F.3d at 1214.

Therefore, in these class-of-one claims, where discrimination is not alleged against a class of persons, "[t]he allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action." <u>Hennigh v. City of Shawnee</u>, 155 F.3d 1249, 1257 (10th Cir. 1998)(holding that the plaintiff who alleged he "was subjected to discipline and a disciplinary proceeding <u>not applicable to any other police officer</u> under the Collective Bargaining Agreement," but not alleging any class-based discrimination, failed to state a claim, as the "Plaintiff did not show how he was treated differently from others similarly situated" (emphasis added))(citing <u>Norton v. Vill. of Corrales</u>, 103 F.3d 928, 933 (10th Cir. 1996)).  In <u>Norton v. Vill. of Corrales</u>, for instance, where the Tenth Circuit found that "it is clear that they are not claiming unequal treatment

on the basis of race, sex or other <u>classifications</u> which require heightened scrutiny," the Tenth Circuit dismissed the complaint, noting that the "Plaintiffs did not explicitly allege they were treated differently from similarly situated persons or corporations." 103 F.3d at 933 (emphasis added).

The Court has quoted this proposition of law -- "[t]he allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action," <u>Hennigh v. City of Shawnee</u>, 155 F.3d 1249 -- in the § 1983 employment-discrimination context where the plaintiff alleged that the defendant discriminated against him based on his race. <u>See Gerald v. Locksley</u>, 785 F. Supp. 2d at 1085, 1133. The Court in that case had before it an equal-protection claim which was, at least in part, a class-of-one equal protection claim, and the cases upon which the Court relied were limited to class-of-one equal-protection claims. <u>See Gerald v. Locksley</u>, 785 F. Supp. 2d at 1133 ("Gerald's failure to allege that he was treated differently than others similarly situated also defeats his Equal-Protection claim.")(citing <u>Marino v. Mayger</u>, 118 F. App'x 393, 299 (10th Cir. 2004)(unpublished) (upholding court's dismissal of the plaintiffs' class-of-one claim for the plaintiffs' failure to "specifically allege that the sheriff treated them differently from similarly situated landowners" by refusing to "enforce the restraining orders" against the defendants); <u>Jennings v. City of Stillwater</u>, 383 F.3d 1199, 1213 (10th Cir. 2004)(upholding summary judgment in favor of defendants on the plaintiff's class-of-one equal-protection claim, noting that "she failed to make an adequate showing that similarly situated persons were treated differently")).

The Tenth Circuit has adhered to the proposition that, at the summary judgment stage, class-based disparate-treatment discrimination claims are subject to the same legal analysis whether based on an equal-protection violation or Title VII violation. <u>See</u>, <u>e.g.</u>, <u>Etsitty v. Utah Transit Auth.</u>, 502

F.3d 1215, 1227 (10th Cir. 2007)("In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."). Showing disparate treatment of similarly situated individuals, while necessary for class-of-one claims and claims where the plaintiff is not a protected-class member, and while sufficient evidence of discrimination to meet the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), class-based prima facie case, is not necessary for class-based equal protection claims. See Sorbo v. United Parcel Serv., 432 F.3d at 1173 (noting that the McDonnell Douglass Cor. v. Green class-based prima facie case requirement that the adverse action be taken in circumstances giving rise to an inference of discrimination "may be (and often is) satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case").  See Hunt v. Central Consol. Sch. Dist., No. CIV 11-1144 JB/WDS, 2013 WL 3214928, at *32-34 (D.N.M. June 12, 2013)(discussing the McDonnell Douglas Corp v. Green framework's requirement that that "a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." (internal quotation marks omitted)). Accordingly, it is also not necessary for a plaintiff in a protected class pleading a class-based equal protection claim, to allege that similarly situated individuals were treated differently.

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute . . . ." Kokkonen v.

Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331-32.

### 1.        Supplemental Jurisdiction.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[22]  Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Ancillary jurisdiction gives federal courts the flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well.  See 13 C. Wright & A. Miller, Federal Practice & Procedure § 3523, at 173 & n.45. (3d ed. 2008).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to

---

[22] The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine."  Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992), and Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at * 5 (D.N.M. November 21, 2011)(Browning, J.)(citing 16 Moore's Federal Practice § 106.04[5] (Matthew Bender 3d ed.)).  In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

## 2.    District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and

fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.

Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should

consider:

> (1)     the claim raises a novel or complex issue of State law,
>
> (2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)     the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental

jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ."

Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the

district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of

28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News

Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir.1998)("[S]ection 1367 has indeed altered

Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994) ("The statute

plainly allows the district court to reject jurisdiction over supplemental claims only in the four

instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F. 3d 1545, 1557

(9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it

is clear that Congress intended the exercise of discretion to be triggered by the court's identification

of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other

grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v.

Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in

the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v.

Lujan, No. CIV 08–0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. April 30, 2009)(Browning,

J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to

prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c)

exists.").  At least one other district court in the Tenth Circuit besides this Court has reached the

same conclusion.  See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan.

1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties

cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

        The Tenth Circuit has held that district courts should generally decline jurisdiction over state

claims when federal claims no longer remain: "When all federal claims have been dismissed, the

court may, and usually should, decline to exercise jurisdiction over any remaining state claims."

Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel.

Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to
> promote justice between the parties, by procuring for them a surer-footed reading of
> applicable law.  Certainly, if the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the state claims should be dismissed
> as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that a

district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c)

applies.  See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M.

September 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only

acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized that a

district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'" Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## ANALYSIS

The Court will grant the MSJ in part.  The Court concludes that the equal-protection claim is the sole federal claim in the case, because the purported "taking claim," as it appears in the Complaint, rests solely on the law of New Mexico and not on federal law.  The Court will grant summary judgment as to the class-of-one equal-protection claim, because Southwest Media has produced no evidence that the Ordinance treats it differently than any other entity that is similarly situated in every material respect in an irrational manner.  The Court will decline to exercise supplemental jurisdiction over the remaining state-law claims, and will, therefore, remand the case.

## I.   THE EQUAL-PROTECTION CLAIM IS THE ONLY FEDERAL CLAIM IN THE CASE.

The Court concludes that the class-of-one equal-protection claim is the sole federal claim. While the parties were not always clear or consistent at the hearing, the parties stated to the Court at the hearing that Southwest Media asserted an additional federal claim: a violation of the Takings Clause of the Fifth Amendment.  Given the confusion about the claims in this case that surfaced at the hearing, the Court has reviewed the Complaint, and determined that Southwest Media has stated only a state taking claim, not a federal taking claim.  The Court, therefore, concludes that the equal-protection claim is the only federal claim in this case.

Confusion about the claims in this case permeated the summary-judgment proceedings.  The

confusion started during the briefing.  Rio Rancho's MSJ began by addressing an apparent First Amendment claim -- hence its characterization of the Ordinance as a reasonable time, place, and manner restriction on speech.  <u>See</u> MSJ at 4-6.  Southwest Media's Response did not address those arguments head-on, but it states that Southwest Media is the victim of political targeting.  <u>See</u> Response ¶ 8, at 2.

The confusion only increased at the hearing.  Southwest Media's counsel was not aware that the Court had set the MSJ for a hearing, and attended the hearing telephonically only after the Court contacted him to invite his participation.  Because of a scheduling error, Southwest Media's counsel was, as he conceded, unprepared for the hearing.  Apparently as a result of not being prepared for the hearing, Southwest Media's counsel equivocated about the nature of his client's claims.  With respect to the taking claim, Southwest Media's counsel stated that his "brief was more related to the state claim" than the federal taking claim, and pointed out that it "didn't cite any federal claims," but instead based its claim on state law.  Tr. at 57:16-19 (Border).  At other points during in the hearing, however, Southwest Media's counsel confirmed that there were two federal claims in the case, including a federal taking claim.  <u>See</u> Tr. at 41:12-15.  Given that Southwest Media's counsel was unprepared for the hearing and somewhat inconsistent during it, recourse to the Complaint itself is the only way to resolve the pervasive confusion about the nature of the claims that Southwest Media asserts.

The sum total of the "taking claim" as it appears in the Complaint is:

## <u>COUNT II -- TAKING CLAIM</u>

24.    The preceding allegations in this Complaint are realleged and incorporated herein by this reference as though stated in full.

25. The enactment of the Ordinance has resulted in Southwest Media's assets being rendered worthless, constituting a taking of personal property rights <u>under the NMSA §42A-1-34 [sic] and the New Mexico Constitution, N.M. Const. Article II, § 20 (2012)</u>, without just compensation.

Complaint ¶¶ 24-25, at 3 (emphasis added). Indeed, Southwest Media does not so much as cite the Fifth Amendment anywhere in the Complaint.[24] Despite the parties' shared misapprehension that the case presented a federal takings claim -- and despite that Southwest Media may well have intended to have assert a federal takings claim -- the Complaint's language is insufficient to state a claim over which the Court could exercise federal-question jurisdiction. See <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). The Court, therefore, concludes that Southwest Media's class-of-one equal-protection claim is the sole federal claim in the case.

## II.  THE COURT WILL GRANT SUMMARY JUDGMENT ON SOUTHWEST MEDIA'S EQUAL-PROTECTION CLAIM.

The Court will grant summary judgment on Southwest Media's purported class-of-one equal-protection claim. The Court concludes that Southwest Media has not produced admissible evidence that the Ordinance treats it differently than any entity that is similarly situated in every material respect. Moreover, the Court concludes that Southwest Media has not produced admissible evidence that Rio Rancho lacks any reasonable justification for the Ordinance.

The Court first turns to Rio Rancho's insistence that Varner's affidavit includes "false

---

[24] Moreover, other documents indicate that there is only a single federal claim in the case. The Notice of Removal states that there is but a single federal claim in the case -- the equal-protection claim. See Notice of Removal ¶ 5.a, at 2. The Joint Status Report and Provisional Discovery Plan is vague: it states that the Ordinance violates the U.S. Constitution, but does not identify a specific provision. See Joint Status Report and Provisional Discovery Plan at 2. The Stipulated Order states that there is "a takings claim"; there is clearly a state-law takings claim, so the singular number in this statement indicates that there is not a federal claim. Stipulated Order ¶ 1, at 1.

averments."  Generally, that a statement is false renders it neither inadmissible nor incapable of creating a genuine issue of material fact for summary-judgment purposes.  As a general principle, witness credibility -- including veracity -- is an issue for the jury at trial and not for the Court at the summary-judgment stage.  There are, however, outer limits to this principle.  As the Supreme Court explained in Scott v. Harris, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  550 U.S. at 380 (videotape of incident directly contradicted plaintiff's version of events).  With this procedural backdrop, the Court turns to Southwest Media's substantive claims.

The Court concludes that Southwest Media has not produced admissible evidence to sustain its equal-protection claim.  As the Tenth Circuit has explained,

> [t]o prevail on [the class-of-one] theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently.  Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d[ at 1210].  A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive," id. at 1211, and "wholly unrelated to any legitimate state activity," Mimics, Inc.[ v. Vill. of Angel Fire, 394 F.3d 836, 849 (10th Cir. 2005)] (quotation omitted). This standard is objective -- if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations. Jicarilla Apache Nation, 440 F.3d at 1211.

Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1216.

Southwest Media produces two pieces of evidence in its Response: Varner's affidavit and a set of photographs.  Neither is helpful on either prong of the Kansas Penn Gaming, LLC v. Collins test.

Southwest Media's effort to establish that Rio Rancho treats it differently from all others that are "similarly situated in every material respect" fails.  Varner's statement that "Southwest is the

only mobile sign company in Rio Rancho," Varner Aff. ¶ 8, at 2, is of no help.  That Southwest Media's signs differ fundamentally from those that others produce means, by definition, that there are no others "similarly situated in <u>every material respect</u>" which Rio Rancho could treat differently without a reasonable justification.  <u>Kansas Penn Gaming, LLC v. Collins</u>, 656 F.3d at 1216 (emphasis added).  It is inevitable that if product A -- mobile signs -- materially differs from product B -- stationary signs -- and if only one firm produces product A, any regulation of product A necessarily affects product A's producers differently from nonproducers.  That Southwest Media lacks competitors does not render Rio Rancho's attempt to regulate its products a violation of the Equal Protection Clause.

Southwest Media's photographs are also of no further help on this prong.  Southwest Media submitted the images -- some of them barely legible -- attached to its Response.  Varner states about them: "The attached exhibits 2-9 shows that other mobile signs are allowed to be parked where traveling public can see them." Varner Aff. ¶ 11, at 2.[25]  Southwest Media does not fully explain what those photographs should demonstrate.  The Court infers that Southwest Media means to imply that its signs do not meaningfully differ from the signs that the Ordinance allows.  If that is Southwest Media's intent, the photographs fail for the same reason that Varner's affidavit fails: pictures of other "mobile signs," without more, are insufficient to demonstrate that the makers of the

---

[25] Rio Rancho's objections to the form of these photographs lack a sound basis in the law. Varner need not swear that he personally took the photographs. As Professors Charles Alan Wright and Victor James Gold indicate, there are several ways to authenticate photographs; the testimony of the person who took them is not the only way to do so.  <u>See</u> 31 C. Wright & V. Gold, <u>Federal Practice and Procedure</u> § 7106, at 44-45 & nn.12-15 (2000).  Rio Rancho's concerns about when and where the photographs were taken may well provide grist for cross-examination and arguments about relevancy and weight, but they are not properly understood as authentication objections.  The Court concludes that, taking all inferences in Southwest Media's favor -- as it must at the summary-

other signs and Southwest Media are "similarly situated in <u>every material respect</u>."  <u>Kansas Penn</u>

<u>Gaming, LLC v. Collins</u>, 656 F.3d at 1216 (emphasis added).   That element requires Southwest

Media to perform a factual comparison -- to present evidence which would demonstrate that its signs

are just like the photographed signs in every material respect.  Southwest Media did not perform that

comparison, but instead cited to photographs of other "mobile signs."  Southwest Media did not,

however, provide photographs of its signs to which the Court could compare the photographs of

other "mobile signs" that Southwest Media provided, which handicaps the Court's ability to

undertake that task itself.  At the hearing, the Court pressed Southwest Media to more concretely

describe its mobile signs; Southwest Media stated that its "mobile signs" are signs with changeable

lettering mounted on a truck, and that it also uses "temporary signs" that it can take to a business, to

be used either on a small trailer or on a frame at the business.  Although some of the photographs are

illegible, the "mobile signs" that the legible photographs depict substantially differ from Southwest

Media's description of its signs: (i) none of the photographed "mobile signs" has changeable

lettering mounted on a truck -- the advertising looks to be permanently affixed to the truck, by paint

or some other method; and (ii) none of the signs is at a business mounted on a small trailer or on a

frame.  Southwest Media also provided the Court with its signs' dimensions, but Southwest Media

did not provide the Court the photographed signs' dimensions.  In sum, it was Southwest Media's

burden either to produce evidence that the makers of the pictured signs and Southwest Media are

similarly situated in every respect, or to explain why the distinctions between them are not material.

Southwest Media has not carried that burden.

   Southwest Media might also point to Varner's statement that "[t]he city sells advertising on

judgment stage -- the photographs are authentic.

their public transportation buses and receives revenue from advertising on the local school buses,"
Varner Aff. ¶ 17, at 2.  Without more detail, this statement is insufficient to carry Southwest Media's
burden, because Southwest Media did not compare the advertising on Rio Rancho's buses to the
mobile signs that it sells in a way that would demonstrate that Rio Rancho and Southwest Media are
"similarly situated in every material respect."  Kansas Penn Gaming, LLC v. Collins, 656 F.3d at
1216 (emphasis added).   For example, the public nature of the buses on which Rio Rancho sells
advertising may well be a "material respect" in which Rio Rancho's advertising differs from
Southwest Media's private mobile signs, because the concerns with regulating placement of
advertising on public-transportation vehicles may differ from the concerns with regulating
advertising on private mobile signs.  The city or public schools, and not commercial entities, receive
the advertising revenue.  Given the city's position as a monopolist with respect to advertising on its
property, it has tools available -- that is, through selection and standards-setting -- to control the
appearance and safety implications of such advertising.  Southwest Media has not carried its burden
to produce evidence demonstrating that Rio Rancho and Southwest Media are similarly situated in
every material respect.

Southwest Media's claim fares no better on its second prong, because it has produced no
evidence that the Ordinance is "irrational and abusive," and "wholly unrelated to any legitimate state
activity."  Rio Rancho has pointed to aesthetic and safety reasons for the Ordinance.  Reply at 7.
Assuming, however, that it is true that Rio Rancho "had never stated why the mobile signs [that
Southwest Media owns] are being banned in the City of Rio Rancho," as Kansas Penn Gaming, LLC
v. Collins makes clear, the "standard is objective -- if there is a reasonable justification for the
challenged action, we do not inquire into the government actor's actual motivations."  656 F.3d at

1216.[26]  In short, the Court and the parties can invent objectively reasonable justifications for a given action after a case has been filed -- and could do so even in the presence of subjective ill will.  See Jicarilla Apache Nation v. Rio Arriba Cnty., 440 F.3d at 1210.

Rio Rancho has at least two reasonable justifications for its decision in the Ordinance: aesthetics and traffic safety.  As the Tenth Circuit explained in a similar context, "preserving neighborhood aesthetics is a legitimate government interest.  Thus, we must uphold [a classification subject to rational-basis review] if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  Schanzenbach v. Town of Opal, Wyo., 706 F.3d 1269, 1276 (10th Cir. 2013).  Although Rio Rancho relied, with little elaboration, on New Mexico law squarely holding that a "sign ordinance regulating the size, height and number of signs is reasonably related to the proper goals of aesthetics and traffic safety," Temple Baptist Church, Inc. v. City of Albuquerque, 98 N.M. 145, 646 P.2d 565, the deferential rational-basis standard allows the Court to elaborate.  First of all, a community could reasonably conclude that a world without signs is more beautiful than a world with signs, and that a world with fewer signs is more beautiful than a world with more signs.  While there is no doubt a town could ban all signs, there is no sound reason to say that the Equal Protection Clause precludes the lesser exercise of power to only ban some signs, i.e., the greater power includes the lesser power.  While beauty is in the eye of the beholder -- for

---

[26] Although it is not material to the outcome, the Court notes that Varner's characterization of the City Council meeting is inaccurate.  Varner contends that "[t]he discussion for the business community was ignored and was targeted at" Southwest Media, Response ¶ 2, at 2.  The Transcript of Rio Rancho City Council Meeting is, however, replete with discussion of the business community's concerns.  See, e.g., City Council Meeting Tr. at 14:5-15:25 (Clayton)(discussing the importance of signage for business).  That Varner's point of view did not prevail does not mean that it was ignored.

example, the signs in Times Square in New York City or the sign on Route 66 in Albuquerque are often considered beautiful and/or historic -- it is fair to say that some signs are probably just uglier than others; a city is entitled to decide what it does and does not like.  About the only way a city's sign ordinance is going to violate the Equal Protection Clause is when it denies signs to African-Americans that it allows Anglos to have, or when it allows corporation A to have the identical signs it does not allow corporation B.[27]

The Court does not, however, have to provide such extreme justifications; more reasonable justifications exist.  For example, Rio Rancho could weigh certain signs' advertising utility against the traffic risks that they present and rationally conclude that the Ordinance properly balances the interests of the business community -- i.e., effective advertising -- with the public interest in traffic safety -- i.e., signage that does not interfere with driving.  Even taking as true that the signs that the Ordinance permits are more dangerous than Southwest Media's signs, Rio Rancho also could rationally conclude that commercial vehicle signs like Southwest Media's -- those signs with a primary purpose other than the stationary display of the sign -- are unsightly, and that the signs that the Ordinance allows -- both generally and on its public buses, subject to its oversight -- would be less unsightly than advertising that private entities might do with their own signs.  Rio Rancho is entitled to balance traffic safety, aesthetic concerns, and the benefits of advertising, among other factors, in designing its scheme; it need not confine itself to a single dimension of analysis, but may conduct a multi-variable calculus.  These justifications are rational bases for the Ordinance's comprehensive regulation of signage.  The Court will, therefore, grant summary judgment as to the

---

[27] To be sure, ordinances like those described might raise First Amendment concerns.  In all likelihood, they would not, however, raise Equal Protection Clause concerns.

equal-protection claim.[28]

In the end, Southwest Media's unhappiness with the Ordinance does not sound in the Constitution's equal-protection guarantees, but instead in a basic disagreement with the line that the Ordinance draws -- heightened by the fact that Southwest Media's signs are on the wrong side of that line. Even if Southwest Media -- or the Court -- might draw the line differently, most of the time, such line-drawing is the business of elected officials, and has been since Lochner v. New York, 198 U.S. 45 (1905), met its demise in West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937). As the Tenth Circuit has warned,

> the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

---

[28] Because Southwest Media has conceded that it has not stated a First Amendment claim, and because the Court has concluded that there is no federal takings claim, the Court has no occasion to consider the parties' disputes regarding whether the Ordinance was a weapon of political targeting or the validity of the Ordinance under state law. Moreover, Southwest Media conceded that, for purposes of this case, the Court need not "consider that the City of Rio Rancho targeted [S]outhwest [M]edia for any sort of political expression, viewpoint discrimination or anything like that." Tr. at 28:13-18 (Court, Border). This conclusion explains why the Court need not address Mobile Sign Inc. v. Town of Brookhaven: that case is, as Rio Rancho states, a First Amendment case. See 670 F. Supp. at 72. It also explains why the Court need not analyze Temple Baptist Church v. City of Albuquerque, which does not raise equal-protection concerns, but rather is principally concerned with free-speech and Takings Clause challenges to a local ordinance. See 98 N.M. at 146-147, 573-574.

Jennings v. City of Stillwater, 383 F.3d at 1210-11.  The Court declines Southwest Media's invitation to turn itself into a "zoning board[] of appeal."  Discovery House, Inc. v. Consolidated City of Indianapolis, 319 F.3d 277, 283 (7th Cir. 2003).

**III.   THE COURT WILL DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS IN THE CASE.**

The Court's conclusion that partial summary judgment in Rio Rancho's favor is appropriate disposes of all federal claims in this case.  Given the Tenth Circuit's guidance that, "[w]hen all federal claims have been dismissed, the Court may, and usually should, decline to exercise jurisdiction over any remaining state claims," Smith v. City of Enid By and Through Enid City Comm'n, 145 F.3d at 1156, the Court concludes that remanding the remaining state-law claims is the appropriate resolution of the matter.  The Court will, therefore, deny the MSJ to the extent that it asks the Court to act upon the claims that arise exclusively under state law.

**IT IS ORDERED** that: the Defendant's Consolidated Motion for Summary Judgment, filed July 25, 2013 (Doc. 15), is granted in part and denied in part.  The equal-protection claim is dismissed without prejudice.  The remaining case and claims are remanded to the Thirteenth Judicial District Court, County of Sandoval, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Dean E. Border
Border Law Office
Albuquerque, New Mexico

      *Attorney for the Plaintiff*

Joel M. Young
French & Associates
Albuquerque, New Mexico

-- and --

Robert W. Becker
Yenson Allen & Wosick, P.C.
Albuquerque, New Mexico

      *Attorneys for the Defendant*